In re JOHN RICHARDS HOMES
BUILDING COMPANY,
LLC, Debtor.

Kevin Adell, Appellant,

v.

John Richards Homes Building Com-
pany, LLC; and Honigman Miller
Schwartz and Cohn, Appellees.

Bankruptcy Case No. 02–54689.
Civil Case No. 12–cv–10506.

United States District Court,
E.D. Michigan,
Southern Division.

July 16, 2012.

David J. Nowaczewski, Ralph E. McDowell, Bodman PLC, Detroit, MI, Fred T. Magaziner, Dechert LLP, Philadelphia, PA, G. Eric Brunstad, Jr., Dechert LLP, Hartford, CT, for Appellant.

Arthur Thomas O'Reilly, Norman C. Ankers, Honigman, Miller, Detroit, MI, for Appellees.

### ORDER AFFIRMING IN PART AND REVERSING IN PART THE BANKRUPTCY COURT'S ORDER

STEPHEN J. MURPHY, III, District Judge.

This appeal from the United States Bankruptcy Court for the Eastern District of Michigan ("Michigan Bankruptcy Court") comes at the closing stages of a complex legal battle that began when Kevin Adell filed an involuntary Chapter 11 bankruptcy petition against John Richard Homes Building Co., LLC ("JRH") in 2002. At issue is whether the Michigan Bankruptcy Court abused its discretion in entering a $4.65 million judgment against Adell for (1) the attorney fees and costs

JRH has incurred in attempting to enforce a $6.1 million judgment entered against Adell by the Michigan Bankruptcy Court in 2003; and (2) punitive damages for Adell's conduct after the entry of judgment. The Court heard oral argument on the appeal on June 6, 2012. For the reasons that follow, the Court will **AFFIRM** the award of attorney fees and costs, and **REVERSE** the award of additional punitive damages.

## BACKGROUND

### I. *Procedural Overview*[1]

Adell filed an involuntary petition for Chapter 11 reorganization against JRH in 2002. *See generally* 11 U.S.C. § 303. The Michigan Bankruptcy Court dismissed the petition in 2003, and, in light of the damage caused to JRH's business and reputation as a result of the petition, it entered a judgment of $6.1 million in compensatory damages, punitive damages, and attorney fees against Adell and two related firms with whom he had conspired, Adell Broadcasting Co. ("ABC") and STN.com. *See id.* § 303(1). This Court and the Sixth Circuit affirmed the award, and the Supreme Court denied certiorari. *See In re John Richards Homes Building Company, LLC,* 291 B.R. 727 (Bankr.E.D.Mich.2003) [hereinafter *JRH I* ], *aff'd,* 312 B.R. 849 (E.D.Mich.2004), *aff'd,* 439 F.3d 248 (6th Cir.2006), *cert. denied,* 549 U.S. 818, 127 S.Ct. 85, 166 L.Ed.2d 31 (2006).

Not long after the Michigan Bankruptcy Court entered its ruling, Adell filed for Chapter 11 reorganization in the United States Bankruptcy Court for the Middle District of Florida ("Florida Bankruptcy Court"). Adell liquidated many of his assets to purchase a mansion in Florida.

The Florida and Michigan Bankruptcy Courts disagreed as to the validity of Adell's claim to Florida's unlimited "homestead" exemption from judgment creditors on the mansion. *Compare In re John Richards Homes Building Co., LLC,* 298 B.R. 591 (Bankr.E.D.Mich.2003) [hereinafter *JRH II] with In re Adell,* 321 B.R. 562 (Bankr.M.D.Fla.2005) [hereinafter *Adell I* ].

The Florida Bankruptcy Court eventually dismissed Adell's petition because Adell was not entitled to a discharge of indebtedness. *In re Adell,* 332 B.R. 844 (Bankr. M.D.Fla.2005) [hereinafter *Adell II* ]. JRH sought sanctions against Adell in Florida Bankruptcy Court, but the bankruptcy judge there refused to award them, a ruling the district court and the Eleventh Circuit upheld on appeal. *In re Adell,* No. 07–cv–361, 2008 WL 746833 (M.D.Fla. Mar. 18, 2008) [hereinafter *Adell III* ] (finding bankruptcy court's decision denying sanctions was not abuse of discretion), *aff'd,* 296 Fed.Appx. 837 (11th Cir.2008).

After the Sixth Circuit affirmed the original, $6.1 million judgment against Adell, he paid that judgment in full on behalf of himself, ABC, and STN.com. Afterwards, JMH, along with lead counsel Honigman Miller Schwartz & Cohn ("HMSC"), returned to the Michigan Bankruptcy Court and moved for additional attorney fees and costs for incurred during post-judgment litigation. These activities included efforts to execute on Adell's real and personal property in various forums, garnishment litigation in the Michigan Bankruptcy Court, and the Florida bankruptcy litigation. The bankruptcy court denied the request, but this Court reversed and remanded. *In re John Richards Homes Bldg. Co., LLC,* No. 02–54689,

---

1. For a more complete listing of the various substantive orders and opinions entered in this case, see *In re John Richards Homes Building Co., LLC,* 461 B.R. 1, 5–7 (E.D.Mich. Bankr.2011) [hereinafter *JRH V* ].

2006 WL 3228523 (Bankr.E.D.Mich. Sept. 21, 2006) [hereinafter *JRH III*], *rev'd and remanded*, 405 B.R. 192 (E.D.Mich.2009). Likewise, the bankruptcy court denied a motion for additional punitive damages filed by JRH based on Adell's post-judgment conduct, which this Court also reversed and remanded. *In re John Richards Homes Bldg. Co., LLC*, No. 02–54689, 2006 WL 3230009 (E.D.Mich.Bankr.Sept. 21, 2006) [hereinafter *JRH IV*], *rev'd and remanded*, 404 B.R. 220 (E.D.Mich.2009).

On remand, this Court instructed the Michigan Bankruptcy Court to reach the merits of JMH's requests for costs, attorney fees, and an additional award of punitive damages. After an evidentiary hearing, the Michigan Bankruptcy Court entered an award of $1.85 million in attorney fees, and $2.8 million in punitive damages. *JRH V*, 461 B.R. at 4. Adell now appeals this additional $4.65 million in damages.

## II. *Adell's Asset Sale and Florida Relocation*

Analysis of the issues presented in this motion requires a narrower focus on the history of the post-judgment proceedings. The Michigan Bankruptcy Court entered its initial, $6.1 million judgment against Adell on April 25, 2003. *JRH I*, 291 B.R. at 729. Adell's response was swift. He liquidated many of his Michigan assets, fled to Florida on May 5, 2003, and purchased a $2.8 million home there in Naples on May 8. *JRH II*, 298 B.R. at 593; *Adell I*, 321 B.R. at 564–65. JRH scrambled to respond. It filed a motion for post-judgment relief on May 21, 2003, requesting that the Court order Adell to sell the home he purchased and turn over the proceeds

in satisfaction of the judgment. Adell defended JRH's request on the grounds that the Florida Constitution's "homestead" exemption prohibited such a sale.[2] *See* Fla. Const. art. X, § 4(a)(1) (exempting "a homestead" from any "forced sale under process of any court" and from any "lien" resulting from a "judgment, decree or execution").

The bankruptcy judge ruled against Adell. The judge found that 11 U.S.C. § 303(1) preempted the "homestead" exemption. *See JRH II*, 298 B.R. at 602–07. He also concluded, as a matter of Florida law, that Adell's "homestead" claim was invalid because he had not established Florida residency. *Id.* at 607–09. The bankruptcy judge ordered Adell to sell his home within sixty days of the September 17, 2003 entry date of *JRH II*, and remit the proceeds in partial satisfaction of the judgment. The Michigan Bankruptcy Court also appointed a receiver on October 3, 2003, after Adell showed recalcitrance in cooperating with *JRH II's* directives. This Court granted a stay of proceedings to execute on the judgment on November 10, 2003, contingent on Adell posting a supersedeas bond of $2.8 million.

## III. *Adell's Bankruptcy Filing in Florida*

On November 14, 2003—the day before the deadline for compliance with the order of September 17 was set to expire—Adell filed for Chapter 11 reorganization in Florida Bankruptcy Court. *See* Notice of Bankruptcy, *In re John Richards Homes Bldg. Co., L.L.C.*, No. 02–54689, ECF No. 543 (Bankr.E.D.Mich. Nov. 18, 2003). With that filing, Adell became entitled to the protections of the automatic stay,

---

2. Adell also attempted to assert this defense by filing a lawsuit against JRH in state circuit court in Collier County, Florida, on May 19, 2003, seeking a declaration that the house he purchased qualified for the homestead exemption. JRH removed the case to federal district court, which transferred the case to the Michigan Bankruptcy Court on June 9, 2003.

which stops judicial proceedings against the individual and halts all efforts by creditors to execute on judgments. *See* 11 U.S.C. § 362. JRH moved to dismiss the Chapter 11 petition, but the Florida Bankruptcy Court denied the motion.[3] *Adell II,* 332 B.R. at 846.

While the appeal of the initial motion to dismiss to the District Court for the Middle District of Florida was pending, the Florida Bankruptcy Court's January 31, 2005 ruling in *Adell I* expressed disagreement with the Michigan Bankruptcy Court's conclusion in *JRH II* in 2003 on the applicability of the "homestead" exemption. By the time the ruling issued, Adell had resided in Florida for 180 days prior to filing the chapter 11 petition, registered to vote in Florida, registered an automobile in Florida, obtained Florida licenses for fishing and driving, opened several Florida bank accounts, started a new business venture in Florida, and formed a Florida not-for-profit company. The Florida Bankruptcy Court concluded that these actions were sufficient to establish "bona fide residence" in Florida, and rejected JRH's overtures regarding the applicability of the "homestead" exemption. *Adell I,* 321 B.R. at 571.

This ruling became moot when the district court reversed the Florida Bankruptcy Court's denial of the motion to dismiss Adell's Chapter 11 petition on May 11, 2005. Adell attempted to convert his case into a Chapter 7 liquidation, but the Bankruptcy Court granted JRH's motion to dismiss the petition entirely on October 4, 2005. *Id.* at 846–49. The bankruptcy judge found that there was "no doubt that [Adell] converted nonexempt assets into

exempt assets . . . that the transfer took place within one year before the date of the filing of the petition; and, based on the circumstances and events surrounding the sudden move to Florida, the transfer was made to hinder, delay, or defraud a creditor, JRH." *Id.* at 849. This statement was not just rhetoric. It was a reference to 11 U.S.C. § 727(a)(2)(A), which prevents the bankruptcy court from granting a discharge to one who has "transferred, removed . . . or concealed . . . property of the debtor, within one year before the date of the filing of the petition."

JRH sought sanctions in the Florida Bankruptcy Court against Adell. The bankruptcy judge denied the request, finding that "Adell attempted to pursue a legitimate goal within the utmost of his ability and, therefore, to impose a sanction would be a double punishment" on top of the Michigan judgment against him. *Adell III,* 296 Fed.Appx. at 839 (internal quotation marks omitted). The district court and the Eleventh Circuit Court of Appeals affirmed that conclusion on appeal as within the bankruptcy judge's discretion.

### IV. *Adell's Financial Condition and Negotiations During Appeal*

Meanwhile, back in Michigan, Adell lost his appeals in both this Court and in the Sixth Circuit Court of Appeals, and the Supreme Court refused to hear his case. No court sanctioned Adell for bringing appeals, even though both had limited authority to do so. *See* Fed. R. Bankr.P. 8020 (permitting district court to impose "just damages and single or double costs to the appellee" if it finds an appeal is

---

**3.** The Florida Bankruptcy Court sanctioned JRH for commencing collection activities immediately after the district court reversed the Florida Bankruptcy Court, because the district court's order did not technically lift the automatic stay. *In re Adell,* 328 B.R. 845,

847–48 (M.D.Fla.Bankr.2005) [hereinafter *Adell IV*]; *see also* Fed. R. Bankr.P. 8017(a) ("Judgments of the district court or the bankruptcy appellate panel are stayed until the expiration of 14 days after entry. . . .").

"frivolous"); Fed. R.App. P. 38. After the appeals concluded, Adell wrote a check for $6,662,005.58, which covered the original judgment plus post-judgment interest.

Adell's financial status during this period is debated extensively by the parties. In 2003, Adell claimed that he "could not afford" to either pay the judgment or purchase a bond. Adell Creditors' Exam. at 6:21–22, ECF No. 16–9. The need to reorganize his limited assets in the most advantageous manner possible, along with a purported sense of shame at being found at fault for bringing an unwarranted involuntary bankruptcy, were his stated motivations for moving to Florida. *Id.* at 6:24–25 (noting his decision to move was based on his fear that he would "lose [his] assets" if the judgment was upheld on appeal). Adell reasserted the position that he was unable to pay the judgment in 2003 in the evidentiary hearing below.[4] Evid. Hr'g Tr. 96:12–14.[5]

On November 9, 2004, thanks to a "gift" from his father, Adell offered what he claimed was a "no-strings-attached" supersedeas bond that would guarantee JRH payment in the event their judgment was upheld on appeal. *See* Mot. for Stay Pending Appeal, *In re John Richards Homes Bldg. Co., LLC.*, No. 03–cv–40109, ECF No. 26 (E.D.Mich. Nov. 9, 2004). But by this juncture, JMH had already spent nearly a year pursuing litigation in the Florida Bankruptcy Court, and was close to achieving dismissal of Adell's petition. Moreover, as the bankruptcy court found in the decision now being appealed, there were indeed "strings" attached to the request. The form of the supersedeas bond Adell proposed required JMH to foreswear "all garnishment proceedings (including actions against [Adell's employers] *STN.com* and Adell Broadcasting) and any other action against Adell and his property, including the appointment of a receiver or the sale of Adell's assets." Mot. for Stay Pending Appeal, Ex. A, at 2. This Court and the Sixth Circuit denied the requests for a stay on execution of the judgment. *See In re John Richards Homes Building Co., L.L.C.,* No. 03–cv–40109, ECF No. 37 (E.D.Mich. Jan. 31, 2005), *aff'd,* No. 04–2154 (6th Cir. Nov. 1, 2005). Likewise, in the proceedings below, the Michigan Bankruptcy Court rejected the argument that JRH's pursuit of litigation after the bond offer was unnecessary. *JRH V,* 461 B.R. at 13.

## STANDARD OF REVIEW

▬ This Court "review[s] the bankruptcy court's findings of fact for clear error." *JRH I,* 439 F.3d at 254 (emphasis removed). Under clear error review, the Court "will not disturb the bankruptcy court's findings of fact unless there is the 'most cogent evidence of mistake of justice.'" *WesBanco Bank Barnesville v. Rafoth (In re Baker & Getty Fin. Serv., Inc.),* 106 F.3d 1255, 1259 (6th Cir.1997) (quoting *Newton v. Johnson (In re Edward M. Johnson & Assoc., Inc.),* 845 F.2d 1395, 1401 (6th Cir.1988)). The Court owes similar deference to the Michigan Bankruptcy Court's legal findings on punitive damages and attorney fees. *See JRH I,* 439 F.3d at 265 (recognizing appellate court "appl[ies] de novo review to [any] constitutional chal-

---

4. In anticipation of this Court's review of the substantive underpinnings of the punitive damages award, the parties provided substantial briefing on Adell's financial status from the time of the judgment onward. Because this debate is largely irrelevant to the grounds on which the Court has chosen to decide the appeal, the Court will not rehash that debate here.

5. These citations refer to the transcript of the evidentiary hearing the bankruptcy court conducted. *See* ECF Nos. 12–2, 12–3, 12–4.

lenge" to a punitive damages award, "but otherwise review[s] only for abuse of discretion"); *Boddy v. U.S. Bankr.Ct. (In re Boddy)*, 950 F.2d 334, 336 (6th Cir.1991) (reviewing court "will not reverse a bankruptcy court's award of fees unless there has been an abuse of discretion"). When reviewing for abuse of discretion, "[t]he question is not how the reviewing court would have ruled, but rather whether a reasonable person could agree with the bankruptcy court's decision; if reasonable people could differ as to the issue, then there is no abuse of discretion." *Barlow v. M.J. Waterman & Assocs., Inc. (In re M.J. Waterman & Assoc., Inc.)*, 227 F.3d 604, 608 (6th Cir.2000). Nonetheless, "[a] court abuses its discretion when it commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *Wietschner v. Ortino (In re Ferro Corp. Derivative Litig.)*, 511 F.3d 611, 623 (6th Cir.2008).

## DISCUSSION

I. *Did the Michigan Bankruptcy Court Have Authority to Impose Additional Punitive Damages?*

The Michigan Bankruptcy Court imposed additional punitive damages of $2.8 million against Adell. It claimed two alternative sources of power to issue this award: its "inherent authority," as described in cases like *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); and § 105(a) of the Bankruptcy Code. Adell argues that the additional punitive damages the Michigan Bankruptcy Court imposed, on top of its award of attorney fees, were improper. Because the Court agrees with Adell that the punitive damages were a criminal sanction, and that criminal sanctions go beyond the powers of the bankruptcy court under both § 105(a) and its "inherent authority," the Court will reverse the judgment below with respect to the punitive damages judgment.

A. *Criminal and Civil Sanctions, Generally*

■ In its previous opinion, the Court found that *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), justified the imposition of civil sanctions "when a party has 'acted in bad faith, vexatiously, want only, or for oppressive reasons.' " *Chambers*, 501 U.S. at 45–46 111 S.Ct. 2123 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). But this portion of the *Chambers* opinion dealt specifically with the inherent authority of trial courts to impose the sanction of *attorney fees*. *See id.* at 40–41, 111 S.Ct. 2123 (describing the district court's imposition of nearly $1 million in attorney fees under its inherent authority). The principal cases *Chambers* relied upon in formulating this standard were similarly limited. *Hutto v. Finney*, 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) ("An equity court has the unquestioned power to award *attorney's fees* against a party who shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." (emphasis added)); *Alyeska Pipeline*, 421 U.S. at 258–59, 95 S.Ct. 1612 (noting that the "bad faith, vexatiously, wantonly, or for oppressive reasons" standard was an exception to the American Rule that militates against attorney fees). *Chambers* did not endorse the idea that substantial punitive damages are appropriate for a trial court to issue as a civil sanction. *See Miller v. Cardinale (In re Deville)*, 280 B.R. 483, 497–98 (9th Cir. BAP 2002) (recognizing that the award in question in *Chambers* was "purely compensatory," and

that it is "apparent from *Chambers* that 'inherent authority' will not suffice to support" penalties in excess of "reasonable compensation"). While the Supreme Court has noted that the rationale for fee shifting under the inherent authority of the courts is "punitive," *See Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), it has never, to this Court's knowledge, authorized "punishments" that go beyond restoration of the status quo.

JRH argues that *Chambers* authorizes the imposition of a "full panoply of sanctions to remedy wrongful conduct ... including an award of punitive damages." JRH's Br. at 21. But neither case it cites in its brief for this proposition actually acknowledged the power of the courts to impose punitive damages as civil sanctions, much less award them. *See Univ. Cooperatives, Inc. v. Tribal Co-op. Marketing Dev. Fed. of India, Ltd.,* 45 F.3d 1194, 1196 (8th Cir.1995) (reversing imposition of attorney fees as a sanction because it disagreed with the underlying finding of contempt); *In re Generes,* 69 F.3d 821, 824 (7th Cir.1995) (agreeing that district court acted within its discretion by imposing costs and attorney fees on a litigant for his bad faith conduct in litigation).

 This absence of authority is explained by the distinction between civil and criminal sanctions for contempt. Civil sanctions are imposed "to coerce future compliance with a court's order, or to compensate for the injuries resulting from the noncompliance." *In re Jaques,* 761 F.2d 302, 305–06 (6th Cir.1985) (internal citation omitted). By contrast, criminal sanctions exist as a means of punishing conduct and "vindicat[ing] the public interest." *Penfield Co. of Cal. v. SEC,* 330 U.S. 585, 590, 67 S.Ct. 918, 91 L.Ed. 1117 (1947); *see also In re Hake,* No. 06–8014, 2006 WL 2846277, at \*2 (6th Cir. BAP Oct. 3, 2006) (criminal sanctions exist "to vindicate the authority of the court"). When courts impose a fine, it will generally be considered a criminal sanction "if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 829, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). Indeed, a mandatory fine of "as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." *Id. Chambers* does not address the power of the courts to impose punitive damages because that case only addressed the civil contempt powers of the courts, and by their very nature, punitive damages are not among those powers.

**B.** *Did the Michigan Bankruptcy Court Impose Criminal Sanctions?*

 The Michigan Bankruptcy Court's punitive damages award constituted criminal, rather than civil, contempt sanctions. The bankruptcy judge had already awarded JRH a sizable judgment, punitive damages authorized by § 303(i) of the Bankruptcy Code, costs, and attorney fees. Adell paid that judgment in full. No present sanction could coerce Adell's compliance with the Court's ultimate judgment or orders because he has already complied. *See Bagwell,* 512 U.S. at 829, 114 S.Ct. 2552 ("When a contempt involved the prior conduct of an isolated, prohibited act, the resulting sanction has no coercive effect.").

This initial impression is confirmed by the Michigan Bankruptcy Court's order. The bankruptcy judge began by observing that its earlier imposition of punitive damages under § 303(i) failed to deter Adell from abusive conduct. *JRH V,* 461 B.R. at 19. In considering the appropriate amount of punitive damages, the bankruptcy court reviewed the "reprehensibility" of Adell's conduct, the proportionality of the

fine to the actual harm done, and comparable penalties. *Id.* at 20–22. The bankruptcy judge did not provide a mechanism for reducing or avoiding the fine by future compliance, as required by *Bagwell* to bring a fine under the civil contempt heading. Finally, the Michigan Bankruptcy Court concluded its analysis by stating that the $2.8 million sanction it imposed "is necessary to accomplish the dual purposes of deterrence and punishment." *Id.* at 22 (emphasis added).

The boundary between civil contempts that are "remedial, and for the benefit of the complainant," and criminal contempts that "vindicate the authority of the court," is not precise. *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911); *see also Bessette v. W.B. Conkey Co.,* 194 U.S. 324, 329, 24 S.Ct. 665, 48 L.Ed. 997 (1904) ("It may not be always easy to classify a particular act as belonging to either one of these two classes.") But this particular case is clear. The punitive damages award entered against Adell was intended to retrospectively punish him for his behavior after he had already complied with the judgment. Therefore, the Court finds that the Michigan Bankruptcy Court's award of additional punitive damages was in the nature of a criminal sanction.

C. *Did the Bankruptcy Court Have the Power to Issue Criminal Sanctions?*

█ Having established that the additional punitive damages award imposed below was "criminal," the Court must next determine whether the bankruptcy court had the authority to impose it. JRH proposes two possible sources for that authority on appeal. First, as touched upon earlier, all trial courts, including the bankruptcy court, have "inherent powers" that may be exercised to "achieve the orderly and expeditious disposition of their cases." *Chambers,* 501 U.S. at 43, 111 S.Ct. 2123; *see also In re Downs,* 103 F.3d 472, 477 (6th Cir.1996) (recognizing that bankruptcy courts share the same authority to impose civil sanctions as the district court). Second, Congress provided independent, statutory powers to the bankruptcy courts for the purpose of enforcing the Bankruptcy Code:

> The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). The Court concludes that neither source of authority empowered the Michigan Bankruptcy Court to enter the new, $2.85 million punitive damages award.

The two circuit courts of appeals that have directly addressed this issue concluded that bankruptcy courts lack authority to impose criminal sanctions such as punitive damages, under both sources of authority proposed by JRH. *See Knupfer v. Lindblade (In re Dyer),* 322 F.3d 1178, 1193, 1197 (9th Cir.2003); *Griffith v. Oles (In re Hipp, Inc.),* 895 F.2d 1503, 1521 (5th Cir. 1990). *Dyer,* which reversed a bankruptcy court's imposition of an additional $50,000 in punitive damages after it had already awarded attorney fees and costs, summarizes the rationale for this conclusion succinctly. It began by rejecting the idea that § 105(a) justified such awards. Section 105(a) only authorizes remedies that are "necessary" or "proper" to "carry[ing] out its provisions," that "enforce" or "implement" the bankruptcy court's orders

and rules, or that "prevent an abuse of process." Criminal sanctions are not needed to achieve these ends. *Dyer*, 322 F.3d at 1193 ("The sanctions associated with civil contempt ... adequately meet" the goals of § 105(a), "rendering serious punitive sanctions unnecessary"); *In re Just Brakes Corp. Sys., Inc.*, 108 F.3d 881, 885 (8th Cir.1997) (concluding § 105(a) does not confer "the power to punish"). The Sixth Circuit, in an unpublished opinion, expressed similar views.[6] *In re Kelvin Pub., Inc.*, 72 F.3d 129, 1995 WL 734481, at *4 (6th Cir. Dec. 11, 1995) (table decision) (rejecting reading of § 105 that would confer[ ] ... "broad remedial powers" on courts to supplement causes of action in the bankruptcy statute, while conceding that it did "give[ ] bankruptcy courts contempt power").

Some courts have suggested that § 105(a) authorizes "any" order that is "necessary or appropriate," and that this might include an order of punitive damages. *See Jove Eng'g v. IRS (In re Jove Eng'g)*, 92 F.3d 1539, 1554 (11th Cir.1996). And it is true that an order need not be strictly "necessary" under § 105(a); the phrase "necessary or appropriate" is disjunctive, rather than conjunctive. *Contra Dyer*, 322 F.3d at 1193 ("[T]he language of § 105(a) authorizes only those remedies 'necessary' to enforce the bankruptcy code."). Rather, it is the verbs of § 105(a)—"carry[ing] out," "enforce," "implement," "prevent"—that persuade the Court that *Dyer* and *Hipp* reach the proper interpretation. All of these words describe a power that facilitates compliance with the Bankruptcy Code and the bankruptcy court's orders, and compliance is one of the central goals of civil contempt sanctions. By contrast, criminal contempt sanctions are neither "necessary" nor "appropriate" tools for such a task. They are imposed for the purpose of punishing those for whom the opportunity to comply has already passed. *Hipp*, 895 F.2d at 1515 ("Criminal contempt is not 'necessary or appropriate to enforce or implement' the court's rules or orders, but is instead intended to vindicate the authority of the court.").

JRH advanced an additional interpretation of § 105(a) during the motion hearing that must be addressed here. In the section of the Bankruptcy Code that immediately follows § 105, which addresses sovereign immunity, Congress waived the immunity of government units as to "an order or judgment awarding a money recovery" from the bankruptcy courts, "but not including an award of punitive damages." 11 U.S.C. § 106(a)(3). According to JRH's argument, because § 106(a)(3) mentions punitive damages, the absence of any provision *barring* punitive damages in § 105 should be taken as an implicit grant of authority for the bankruptcy court to impose them. If § 105 were the only provision of the Bankruptcy Code affected by § 106(a)(3), then JRH's argument might have merit. But Section 106 waives governmental immunity for *fifty-nine* provisions of the Bankruptcy Code—including some provisions that explicitly authorize the imposition of punitive damages, such as the sections on involuntary petitions (§ 303) and the automatic stay (§ 362). 11 U.S.C. § 106(a)(1). Contrary to JRH's assertions, there *is* a need for such an exclusion from § 106(a)(3)'s waiver outside of § 105. It would be highly

---

6. The Court is inclined to give *Kelvin* somewhat more weight because the Sixth Circuit largely adopted its reasoning in a subsequent, published opinion. *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 423 (6th Cir.2000) (adopting *Kelvin's* holding that § 105(a) does not create private causes of action where the bankruptcy code itself does not create liability).

unusual if a statutory provision designed to circumscribe punitive damages in one context implicitly authorized them in another. Therefore, the Court will not adopt this particular reading of § 105(a).

The *Dyer* court next considered whether the inherent power of the bankruptcy court to impose sanctions justified punitive damages. This authority differs from § 105(a) authority "in at least two ways": it requires explicit findings of bad faith or willful misconduct, and it only permits the court to issue sanctions for violations of a specific order. *See Price v. Lehtinen (In re Lehtinen)*, 564 F.3d 1052, 1058 (9th Cir.2009). But while inherent authority may reach different types of conduct worthy of contempt sanctions, it does not alter the *type* of sanctions the Court is permitted to impose. *Dyer* concluded that "[t]he bankruptcy court's inherent sanction authority ... does not authorize significant punitive damages" either, for "the same reasons" such awards are inappropriate under § 105(a). *Dyer*, 322 F.3d at 1197. Additionally, it observed that bankruptcy courts cannot provide the due process protections necessary to cabin the imposition of punitive sanctions in the absence of express congressional authorization. *Id.* at 1194–95, 97.

The Sixth Circuit seems inclined toward accepting the views articulated above. It has favorably cited the Fifth Circuit's view on bankruptcy courts holding criminal contempt powers. *In re Baker & Getty Fin. Servs., Inc.*, 954 F.2d 1169, 1174 (6th Cir. 1992) (citing the *Hipp* case). The lone case from the Sixth Circuit Bankruptcy Appellate Panel that directly addressed this issue also endorsed the view of the Ninth and Fifth Circuits and suggested it was the most likely position the Sixth Circuit would take. *In re Hake*, 2006 WL 2846277, at *4. During the motion hearing, JRH asserted that the Sixth Circuit's deci-sion in *In re Tenn–Fla Partners*, 226 F.3d 746 (6th Cir.2000), binds the Court's judgment in this case. The *Tenn–Fla* panel noted that an award of punitive damages "lies within the discretion of the trial court," but upheld the bankruptcy court's decision to deny those damages. *Tenn–Fla*, 226 F.3d at 746. Neither the bankruptcy court nor the Sixth Circuit considered the issues raised in this case. It denied punitive damages because it was "not concerned that this debtor will repeat its fiduciary abuses." *In re Tenn–Fla Partners*, 170 B.R. 946, 973 (W.D.Tenn. Bankr.1994). The Court concludes that JRH's reading of *Tenn–Fla* is not persuasive.

Other circuits have hinted at, but not reached, conclusions contrary to the one reached by the Fifth and Ninth Circuits. Two circuits, the First and the Tenth, mention the possibility that bankruptcy courts possess criminal contempt powers, but do not analyze the question with the thoroughness exhibited in the *Dyer* and *Hipp* decisions. *See Hake*, 2006 WL 2846277, at *4 (citing *Eck v. Dodge Chem. Co. (In re Power Recovery Sys., Inc.)*, 950 F.2d 798, 802 n. 17 (1st Cir.1991) and *Graham v. United States (In re Graham)*, 981 F.2d 1135, 1142 (10th Cir.1992)). These statements are best characterized as dicta, and they are unpersuasive when viewed next to the positions of the Fifth and Ninth Circuits.

The Eleventh Circuit's *Jove* opinion suffers similar flaws. Moreover, *Jove* has been used by a number of district courts within that circuit to authorize the imposition of punitive damages. *See In re Wasson*, No. 06–bk–02669, 2007 WL 4322444 (M.D.Fla.Bankr.2007); *In re Dynamic Tours & Transp.*, 359 B.R. 336 (M.D.Fla. Bankr.2006). At the motion hearing, JRH relied upon both *Wasson* and *Dynamic Tours* to support its position on the propri-

ety of a bankruptcy court issuing punitive damages. But the Court declines to follow *Jove* and those cases relying upon it. The Eleventh Circuit's comment on the breadth of § 105(a), insofar as it discussed punitive damages, was dicta. Punitive damages were already foreclosed by virtue of the creditor's sovereign immunity. *Jove*, 92 F.3d at 1559. Moreover, as explained in more detail above, its unreasoned statement on the power of the bankruptcy court to issue "punitive" orders is not persuasive. It neither addresses the limitations the Supreme Court put on that power in *Chambers*, nor the careful wording of § 105(a)'s grant of authority to enforce the Bankruptcy Code.

■ "Because a federal court's inherent powers carry great 'potency,' they must be exercised with 'restraint and discretion.'" *Brown v. City of Upper Arlington*, 637 F.3d 668, 675 (6th Cir.2011) (quoting *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123). The same can be said of § 105(a). Those aims do not appear to be reflected here. Therefore, this Court must reverse the judgment of the Michigan Bankruptcy Court as it pertains to the award of punitive damages.

## II. *The Award of Attorney Fees and Costs*

Section 303(i) of the Bankruptcy Code allows a "reasonable attorney's fee" when an involuntary petition is dismissed. In its order remanding this matter to the Michigan Bankruptcy Court, the Court held that § 303(i) of the Bankruptcy Code "permit[s] the award of attorney fees and costs that were incurred after the dismissal of the petition." *JRH III*, 405 B.R. at 199. On remand, the Michigan Bankruptcy

Court awarded $1,854,192.73 in attorney fees and costs to JRH. Adell has appealed that ruling. He makes five principal arguments [7]: (1) § 303(i) does not permit a party to receive attorney fees for collateral proceedings; (2) the fee request was improper because it was made by Honigman and the other law firms, and not JRH; (3) the fee award was unreasonably large; (4) fees incurred after Adell proposed the supersedeas bond were not necessary for JRH to incur; and (5) the Michigan Bankruptcy Court disregarded this Court's mandate by not giving sufficient consideration to the Florida proceedings. The Court finds none of these contentions persuasive, and will uphold the attorney fees and costs award in full.

### A. *Does § 303(i) Permit Attorney Fees for Collateral Proceedings?*

■ JRH spent nearly a quarter of a million dollars in post-judgment litigation in the Michigan Bankruptcy Court on the $6.1 million judgment, and another quarter of a million dollars defending it on appeal. But its greatest expenses were incurred in the Florida bankruptcy litigation, with approximately $1.3 million spent opposing Adell's bankruptcy filing. Some additional expenses were also incurred in collection proceedings in California. This Court has already ruled that all of the litigation arising from Adell's involuntary petition, including the Florida litigation, is compensable under § 303(i). *JRH III*, 405 B.R. at 215. Adell raises a new issue in this appeal that is worthy of deeper consideration: he argues that § 303(i) only permits awards for fees incurred in the involuntary bankruptcy proceeding itself, and not for work performed in collateral proceedings,

**7.** Additionally, Adell's appeal renewed arguments regarding claim and issue preclusion in an effort to preserve them for appeal to the Sixth Circuit. He acknowledged that this Court has already squarely rejected these arguments. The Court relies on its previous rulings as to these arguments, and will not address the matter further here.

like the Florida bankruptcy litigation. This argument is based on the presumption in federal common law against awarding attorney fees absent explicit authorization. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Resources,* 532 U.S. 598, 602, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001).

Section 303(i)(1)(B) is a fee-shifting statute, meaning that "[w]hen an involuntary petition is dismissed, the debtor is presumed to be entitled to reasonable fees and costs." *In re Maple–Whitworth,* 556 F.3d 742, 746 (9th Cir.2009). As a general rule, in fee-shifting schemes, all costs reasonably incurred in litigating the fee action are compensable, including fees spent to enforce a judgment or collect fees. *Balark v. Curtin,* 655 F.2d 798, 803 (7th Cir.1981) ("An award of compensation for injuries ... would be 'diluted' if fees were denied to plaintiffs required to contest substantial efforts to resist or obstruct the collection of civil rights judgments. The victory would be hollow if plaintiffs were left with a paper judgment not negotiable into cash except by undertaking burdensome and uncompensated litigation."); *Weisenberger v. Huecker,* 593 F.2d 49, 54 (6th Cir.1979) (reasoning, in the context of the Civil Rights Act's fee-shifting provision, that "implementation of Congressional policy requires the awarding of attorney's fees for time spent pursuing attorney's fees in the cases presently under review").

A similar theory buttresses § 303(i). As this Court found earlier, "if the petitioner appeals the dismissal or the involuntary petition causes other litigation, the alleged debtor continues to suffer damages for which there should be compensation." *JRH III,* 405 B.R. at 215. The Ninth Circuit has concurred in this assessment. *See In re S. Cal. Sunbelt Developers, Inc.,* 608 F.3d 456, 463 (9th Cir.2010) (holding, in a § 303(i) case, that " 'it would be inconsistent to dilute a fees award by refusing to compensate attorneys for the time they reasonably spent in establishing their rightful claim to the fee' " (quoting *Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 981 (9th Cir.2008))); *see also* 2 *Collier on Bankruptcy* ¶ 303.33[4][b] (16th ed. 2009) (noting that a "reasonable" fee award also includes fees expended "in the pursuit of costs and damages under [§ 303(i) ]").

Adell argues that § 303(i) does not explicitly authorize fees for expenses incurred litigating in other forums to enforce a judgment. But he presents no legal basis for drawing a distinction between "collateral" and "primary" litigation in fee-shifting statutes. And given the policies animating fee-shifting provisions, it should not matter whether post-judgment litigation is pursued in the forum where the judgment was entered, or another forum. *See, e.g., Prandini v. Nat'l Tea Co.,* 585 F.2d 47, 53 (3d Cir.1978) ("If an attorney is required to expend time litigating his fee claim, yet may not be compensated for that time, the attorney's effective rate for all hours expended on the case will be correspondingly decreased. Recognizing this fact, attorneys may become wary about taking ... cases for which attorneys' fees are statutorily authorized."). This is particular true when a judgment debtor files for bankruptcy. The judgment creditor has no choice but to follow the debtor into the bankruptcy court in order to preserve the viability of the judgment. To not include reasonably necessary ancillary litigation in an attorney fees award would undermine the ends of § 303(i), an interpretation the Court is disinclined to adopt. *JRH III,* 405 B.R. at 215 ("[I]f the petitioner appeals the dismissal or the involuntary petition causes other litigation, the alleged debtor continues to suffer damages for which there should be compensation.").

Moreover, it is not strictly true, as Adell argues, that requests for fees from collateral proceedings are unprecedented. For instance, in explicating the Civil Rights Act's fee-shifting provision, 42 U.S.C. § 1988,[8] the Supreme Court has endorsed the idea that work performed in outside administrative proceedings could be compensated by the federal court under § 1988 if such work "was both useful and of a type ordinarily necessary to advance the civil rights litigation." *Webb v. Bd. of Educ. of Dyer Cnty.*, 471 U.S. 234, 243, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985). In an unpublished decision, the Sixth Circuit observed that, under *Webb*, "[a]n award of fees for ancillary proceedings is proper if the work was 'useful and of a type ordinarily necessary' to secure the relief requested in the primary proceeding." *Grand Traverse Band of Ottawa & Chippewa Indians v. Director, Mich. Dep't of Nat. Res.*, 149 F.3d 1183 (table), 1998 WL 385891, at *7 (6th Cir. July 1, 1998) (quoting *Webb*, 471 U.S. at 243, 105 S.Ct. 1923) (upholding lower court's denial of attorney fees in state court proceedings, in recognition of rule that criminal proceedings prior to institution of civil-rights action are generally non-compensable). Moreover, at least three of the regional circuits have permitted fees to be awarded for state-court litigation that was "necessary" to defend a party's rights in federal civil rights cases under § 1988.[9] Since § 1988

does not explicitly authorize fee awards in collateral proceedings, either, the Court agrees with JRH that this objection carries little weight.

In addition, several district courts have awarded supplemental fees to parties forced to oppose a bankruptcy in order to protect their judgments. The leading case is *Pinshaw v. Monk*, 565 F.Supp. 44 (D.Mass.1983). In *Pinshaw*, the defendant filed bankruptcy while a § 1983 case was pending against him, but before the entry of judgment. *Pinshaw*, 565 F.Supp. at 45. The court granted a fee application under § 1988 covering expenses the plaintiff incurred to "to prevent discharge of any judgment rendered" in the district court case. *Id.* Two other district courts have followed *Pinshaw's* holding in the civil-rights context, focusing on the goals of fee-shifting provisions rather than on the forum where the fees were incurred. *Seibel v. Paolino*, 249 B.R. 384, 387 (Bankr.E.D.Penn.2000); *Williams v. Ingram*, No. 00–1815–C, 2006 WL 3776366, at *4 (S.D.Ind. Dec. 21, 2006). The Court finds those rulings applicable here, given § 303(i)'s similarly broad remedial purpose of restoring the victim of a frivolous involuntary bankruptcy filing to his or her financial status prior to the proceeding.

Adell argues that *Children's Center for Developmental Enrichment v. Machle*, 612 F.3d 518 (6th Cir.2010), bars this award. It

---

8. "In any action or proceeding to enforce a provision of [the civil rights laws], the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs...." 42 U.S.C. § 1988(b).

9. *See Lampher v. Zagel*, 755 F.2d 99, 102–04 (7th Cir.1985) (affirming attorney fee award by federal district court for civil rights plaintiffs participation in a state-court forfeiture action that raised the same constitutional question raised in the plaintiffs declaratory judgment action); *Stathos v. Bowden*, 728 F.2d 15, 22 (1st Cir.1984) (allowing plaintiff

in a § 1983 action to collect attorney fees for defense of a declaratory judgment action in state court that would have precluded their federal claims if it was not successfully opposed); *Bartholomew v. Watson*, 665 F.2d 910, 912–14 (9th Cir.1982) (approving award of attorney fees arising from an Oregon state court action initiated by defendants because "the state court proceedings were an essential step in the presentation of [plaintiffs'] section 1983 claim because of the *Pullman* abstention rule" (emphasis added)).

does not. In *Machle*, the district court dismissed a complaint filed by the defendant against the plaintiff because of a failure to exhaust administrative remedies. *Machle*, 612 F.3d at 520. The plaintiff prevailed in the administrative proceedings, then brought a new lawsuit against the defendant in district court, seeking attorney fees under § 1988. The Sixth Circuit affirmed the district court's denial of the request, finding that because the action was a stand-alone claim for attorney fees, and was not made in an action "to enforce § 1983 or another listed civil rights law," it was improper. *Id.* at 523. This case, as well as those cited above, is distinguishable from *Machle*. Section 303(i) does not contain § 1988's requirement that fee requests be filed "in an action to enforce a provision of" the substantive laws in question. But even if it did, the fee request in this case was properly made in the original involuntary bankruptcy action brought by Adell in support of the judgment entered by the Michigan Bankruptcy Court. The concern articulated in *Machle* about bringing a completely separate action for attorney fees, based on litigation entirely unrelated to a viable federal claim, is not present here. Therefore, *Machle* does not bar the fee award in this case.

▮▮▮ In summary, the Court finds that a bankruptcy court may award attorney fees and costs in post-judgment proceedings under § 303(i) for time spent litigating in collateral proceedings in other forums. Provided the monies spent by the party enforcing the judgment are " 'actually and reasonably expended in the prosecution of the litigation,' " *JRH V*, 461 B.R. at 12–13 (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir.2008)), collateral proceedings should be treated no differently from proceedings in front of the bankruptcy court for the purposes of determining a reasonable attorney fee. In this case, substantial record evidence suggested that Adell filed his Chapter 11 petition in the Florida Bankruptcy Court to avoid posting a bond while he exhausted his appeals, and to obtain more favorable forum after the Michigan Bankruptcy Court ruled against him on the "homestead" exemption question. The bankruptcy judge concluded that "JRH's extended legal battle to challenge Adell's bankruptcy was absolutely necessary for it to obtain any real relief from Adell's wrongful involuntary bankruptcy petition." *JRH V*, 461 B.R. at 11. Had JRH not opposed Adell's bankruptcy, and the Florida Bankruptcy Court granted him a discharge of indebtedness, the judgment against Adell "would have been just a piece of paper." *Id.* This conclusion was not an abuse of discretion, and therefore, the award of attorney fees withstands this assignment of error

### B. *Was the Fee Request Procedurally Improper?*

Adell argues that the fee award is an improperly filed ancillary action over which the Court lacks subject-matter jurisdiction. *See Hudson v. Coleman*, 347 F.3d 138, 141–46 (6th Cir.2003) (affirming district court's decision to quash writs of garnishment as beyond the ancillary jurisdiction of the federal courts). But the Court has already rejected Adell's argument on a prior occasion. *See JRH V*, 405 B.R. at 199 ("Adell's arguments that there is no jurisdiction or standing because ... the application was filed not by JRH but by HMSC after the payment of the judgment are entirely unpersuasive."). *Hudson* says nothing to the contrary, and no persuasive argument for reconsidering the Court's prior order has otherwise been made. Accordingly, the Court rejects this argument.

### C. *Was the Fee Unreasonably Large?*

▮▮▮ Adell argues that the Michigan Bankruptcy Court's ultimate award of attorney fees was unreasonably high. The

bankruptcy judge rejected most of Adell's objections to the claim for attorney fees, but did agree that some of the details of the fee application were inadequate. Accordingly, it reduced the fee award by fifteen percent to restrict JRH to fees which it had substantially justified. *See Sykes v. Anderson,* 419 Fed.Appx. 615, 618 (6th Cir.2011) (deeming an across-the-board fee reduction of twenty-five percent to address duplicative billing within the discretion of the district court); *see also Hensley v. Eckerhart,* 461 U.S. 424, 436–37, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("The court necessarily has discretion in making [the] equitable judgment" about the size of an award of attorney fees). The bankruptcy court considered, and rejected, all of Adell's other arguments, and approved of JRH's fee request.

Adell argues on appeal that the reduction in the award was "simply insufficient" to address the fee application's lack of detail and perceived overstaffing issues. But even if the Court were to reach a different conclusion examining the evidence for itself, the Michigan Bankruptcy Court "found no substantial evidence that assignments were overstaffed; that there was unnecessary duplication of services; that hourly rates were too high for the services performed; that excessive hours were spent; or that any costs were actually overhead." *JRH V,* 461 B.R. at 12. Other than assertions that the Michigan Bankruptcy Court "got it wrong," Adell presents nothing in his brief that would show either a legal error or a clearly erroneous factual basis for the award. Because this Court can only reverse a fee award when there is an "abuse of discretion," it concludes that the attorney fees award cannot be reversed on this ground.

**D.** *Was Litigation After the Posting of the Supersedeas Bond "Necessary?"*

 Next, it was not "plain error" for the Michigan Bankruptcy Court to find

that JRH's decision to continue litigating after it offered to post a supersedeas bond was justifiable. Both this Court and the Sixth Circuit denied Adell's motion to approve the bond at the time Adell offered it to JRH in order to stay collection proceedings. That decision is now the law of the case, and the parties raise no compelling grounds for revisiting these prior decisions. *See Yeschick v. Mineta,* 675 F.3d 622, 633 (6th Cir.2012). There is no tenable way for the Court to hold that the litigation in Florida was "unnecessary" upon Adell's tender of the supersedeas bond when both this Court and the Sixth Circuit refused to accept Adell's request to stay execution proceedings at the time he made it.

Second, as JRH argues in its brief, a contrary ruling would suggest that after spending a year opposing a bankruptcy filed solely for the purpose of obstructing its judgment, it was expected to drop all collection efforts when Adell offered the bond. By the time Adell offered the bond, JRH had expended approximately $1 million in litigation expenses in an effort to protect its judgment. JRH was within its rights not to consent to the bond and pursue immediate satisfaction of the judgment. For these reasons, and the reasons given in the Michigan Bankruptcy Court's order below, the Court concludes that the bankruptcy judge's finding that legal work performed after Adell proposed the supersedeas bond was "necessary," and therefore compensable, was not clear error.

**E.** *Did the Michigan Bankruptcy Court Adequately Consider the Florida Bankruptcy Court's Findings?*

 Adell next argues that the Michigan Bankruptcy Court did not adequately take into consideration the proceedings in

the Florida courts in assessing damages, as directed by this Court's remand order. *See United States v. Connally*, 37 F.3d 1500 (table), 1994 WL 533055 (6th Cir. Sept. 30, 1994) ("The district court is bound on remand by the decision of a superior court and may not consider any issue which that court's mandate has laid to rest."). With respect to JRH's fee application, this Court directed the Michigan Bankruptcy Court to "consider all circumstances in making an equitable determination whether attorney fees should be granted, including what transpired between the parties in the Florida court proceedings." *JRH III*, 405 B.R. at 200.

The Court agrees with JRH that the bankruptcy judge adequately weighed the Florida proceedings in making his determination. With respect to the fee application, the Michigan Bankruptcy Court found that the refusal of the Florida courts to award fees carried little weight in its determination because "the standards by which those courts denied those requests are different from the standard by which the present request is to be determined." *JRH V*, 461 B.R. at 10. This is a reasonable assessment of the interaction of the Florida court rulings and the questions set before the Michigan Bankruptcy Court. When a superior court asks an inferior court to consider an issue, it is an acceptable response to consider the issue and find it carries little weight. In light of the law framing these issues, it cannot be said that the bankruptcy judge committed an abuse of discretion on this point. Therefore, the attorney fee award withstands this challenge, as well.

## CONCLUSION & ORDER

While the parties disagree on the precise characterization of Adell's conduct in this case, there is no dispute that he strained every nerve to frustrate JRH's collection of the judgment the Michigan Bankruptcy Court duly entered against him. The fee-shifting provision of § 303(i) entitles JRH to compensation for its efforts to preserve that judgment from Adell's evasive tactics. Nonetheless, even in the face of egregious litigation misconduct, courts must exercise their powers with great care and discretion. Upon careful consideration of this Court's previous orders, the arguments of counsel, and the relevant law, the Court must conclude that the punitive damages award entered against Adell was an abuse of discretion.

**WHEREFORE,** it is hereby **ORDERED** that the Michigan Bankruptcy Court's order is **AFFIRMED IN PART** with respect to the award of attorney fees and costs, and **REVERSED IN PART** with respect to the award of punitive damages.

**SO ORDERED.**